UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20492-CIV-SEITZ/SIMONTON

ROSA GALDAMEZ,

                Plaintiff,

vs.

DHL AIR EXPRESS (USA),

                Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant DHL Air Express (USA), Inc.'s Motion

for Final Summary Judgment [DE-22] on all claims in Plaintiff Rosa Galdamez's Complaint [DE-

1]. Galdamez, an employee of DHL, alleges the following claims in violation of Title VII, 42

U.S.C. §2000e, *et seq.*: (1) gender, nationality, and race discrimination based on disparate

treatment; (2) hostile work environment; and (3) retaliation. These claims arise from the denial

of Galdamez's request for light duty in May 2010 by DHL supervisor Robert St. George, two

written reprimands against Galdamez in September 2010 by DHL supervisor Jennifer Campbell,

and St. George's mistreatment of Galdamez with regard to discipline and general work

supervision matters. Because the undisputed facts do not support a prima facie case on any of

Galdamez's claims, DHL's motion for summary judgment is granted.

## I.    Material Facts[1]

Galdamez, a Hispanic female from El Salvador, has worked at DHL's Miami International

Airport location ("DHL Miami") since 2000. Deposition of Rosa Galdamez ("Galdamez Dep.")

---

[1] This section sets out the facts in the most favorable light to Galdamez, as drawn from
the depositions, exhibits, and affidavits in the record. The Court cites to the documents docket
entry the first time a record source is mentioned.

[DE 24-1], at 9; 44:5-10.[2] For the majority of her time there, Galdamez held the job title of International Service Agent.  Grossman Decl., ¶ 3.  One of Galdamez's primary duties was to lift and carry heavy cargo.  As such, the job is often physically demanding.

Robert St. George has been a supervisor for DHL Miami since 2004 and has been Galdamez's direct supervisor at various points throughout her employment with DHL.  In 2005, as a result of an interview process conducted by DHL Miami's management, including St. George, Galdamez was promoted to lead agent, a position requiring more responsibility over the tasks performed by the other agents in a team.  Galdamez resigned from the lead agent position in 2008 but continued working for DHL Miami as a service agent.  In May, 2010, Galdamez was working under St. George's direct supervision in a team of twenty to twenty-five agents.  Galdamez Dep., at 14:15-19.  In 2011, St. George was appointed Senior Operations Supervisor.  Deposition of Robert St. George ("St. George Dep.") [DE-36], at 9:2-6.

### A.     St. George's Denial of "Light Duty"

As a unionized employee, Galdamez's relationship with DHL Miami is governed by a Collective Bargaining Agreement ("CBA") [DE 23-3].  Pursuant to DHL Miami's internal policies and the CBA, unionized employees can report discrimination or harassment by: (1) reporting the issue to their supervisor; (2) communicating directly with human resources; (3) calling a 24-hour company hotline; or (4) filing a grievance with the shop steward.  Grossman

---

[2]  DHL Miami consists of various departments, each of which is subdivided into shifts.  Declaration of DHL Miami Senior Operations Manager Jeffrey Grossman ("Grossman Decl.") [DE 23-1], ¶ 7.  Under the Collective Bargaining Agreement between DHL Miami and its unionized employees, employees bid for shifts every six months, with seniority governing the order of the bidding process.  Each shift consists of (i) a shift supervisor, (ii) a "lead" agent below the supervisor, and (iii) the remainder of the team, consisting of service agents.  *Id.*, ¶ 8.  The size of each team depends on the nature of the task and the amount of time required to complete it.

Decl., ¶ 12.

Under the CBA, DHL had the discretion to implement a modified – or "light duty" – work program designed to provide a "temporary opportunity to those employees who are unable to perform their normal work assignments due to a disabling on-the-job injury." CBA, § 2. In May, 2010, DHL had a light duty program in place at DHL Miami. Pursuant to the CBA, if an employee on light duty was not able to perform the assigned tasks, the employee was either reassigned work "within his/her physical capabilities or returned to full...worker's compensation benefits." *Id.* On July 17, 2010, DHL terminated the program for all DHL Miami employees. After that date, employees who were injured on the job would become eligible for workers' compensation benefits and were required to obtain a medical release before returning to work.

On May 6, 2010, Galdamez injured her knee on the job while carrying a package. Galdamez Decl., ¶ 5 [DE 31-4]. Galdamez received medical treatment and was given clearance to work with certain restrictions, including a limitation on lifting more than twenty pounds and certain restrictions on pulling, bending, and standing. May 13, 2010 Work Status Report [DE 31-6, at 2].[3] The next day Galdamez returned to work, gave the note to St. George, and requested that he place her on light duty. Galdamez Decl., ¶ 7. St. George denied the request.[4] *Id.*, ¶ 8.

---

[3] Although Galdamez's declaration opposing the Motion for Summary Judgment states that she gave the medical note to St. George "on or about May 7, 2010," *see* Galdamez Decl., ¶ 6, the note attached to Galdamez's response to DHL's motion indicates that she was actually seen on May 13, 2010, seven days after her injury. *See* [DE 31-6].

[4] According to Galdamez's declaration, St. George's response upon seeing her doctor's note was: "I don't care about your medical note, you will keep working full duty." Galdamez Decl., ¶ 7. However, in her July 2012 deposition, Galdamez testified as follows:

The accident was on May 6th. I went to the doctor, the doctor give me the paper. I went the next day to his office and I say listen, this the one the doctor gave me.

Galdamez also spoke with DHL Miami's HR Representative Jennifer Lundy and the shop steward, who told Galdamez that they could not resolve her problem and that she had to continue on full duty. Galdamez Dep., at 153-54. Galdamez maintains that two other male coworkers, Antonio Moran and Justin Lopez, were on light duty at the time of her request. *Id.* However, at that time these individuals were working for a different supervisor. In deposition, Galdamez stated that she did not know if any other employee on St. George's team was on light duty from May to June 2010. *See* Galdamez Dep., 71:11-25; 72:1-6.

After being denied light duty, Galdamez continued to work full duty for approximately twenty-eight days. *Id.*, at 52:2. At some point in early June, 2010 Galdamez wrote a letter of complaint to her manager. *Id.*, at 68:2-6.[5] The following day, the shop steward assigned Galdamez an office job. *Id.*, at 68:16-25. According to Galdamez, two weeks later she was told: "no more light duty, you have to go back to the warehouse." *Id.*, 69:2-4. Around late June or early July 2010, Galdamez returned to the doctor and received a release to work full duty. *Id.*, 69:10-17. At the time of the July 2010 doctor's visit Galdamez was feeling no pain on her injured knee. *Id.*

On June 9, 2010, Galdamez's attorney wrote to DHL's legal department regarding Galdamez's potential Title VII claims in connection with St. George's denial of light duty. *See*

---

He said Rosa, you have to go home....

I say, can I stay like everybody on light duty?

He say no, you can't.

Galdamez Dep., at 151:13-25; 152:1 (errors in original).

[5] This letter is not in the record, and Galdamez does not identify the manager by name.

Letter from Mayra L. Gonzalez, Esq. to DHL Air Express, S.A. [DE 31-7].  The letter also stated that Galdamez's documented medical conditions – hypertension and the knee injury – "stem from difficulties" with St. George, and that Galdamez decided to resign as lead agent in 2008 because St. George "was making her daily work life impossible." *Id.*

### B.    June 10, 2010 Meeting With St. George

Around noon on June 10, 2010, St. George approached Galdamez and told her in a loud voice to come into his office.  Galdamez Dep., at 101:3-6.  Once there, St. George told Galdamez that she was not doing her job well and was socializing too much. *Id.*, at 101-11.  Also present at St. George's office at the time were Grossman and Roberto Garcia, the shop steward.  About an hour after this meeting, St. George followed Galdamez to her car, where she was taking her break. *Id.*, at 103.  St. George approached Galdamez's car and asked her where she was going. *Id.*, at 107.  St. George did not touch Galdamez or her car. *Id.*  Although she did not recall her exact response, Galdamez testified that she told St. George she was taking her break or probably "going to the doctor." *Id.*, at 106:14-19.  After she answered, St. George turned around and left. *Id.*, at 108.  During this time, Galdamez had been missing time at work to go to doctor's appointments relating to her injury. *Id.*, at 109:22-25; 110:1.

On June 16, 2010, Galdamez filed a grievance through her union. *See* [DE 31-9, at 2]. The grievance states that St. George "is allowed to harrass (sic)" Galdamez and expressly refers to the June 10, 2010 meeting. *Id.*[6]  The grievance states further that "[n]umerous employees have witnessed Robert St. George harrassing (sic) me." *Id.*  Attached to the grievance is a typed note,

---

[6]  Contrary to her deposition testimony, the cover page of Galdamez's grievance states that Grossman and another DHL employee, Ken Grace, were present at the meeting. *Id.*

apparently signed by Galdamez, which states that St. George called her into his office on June 10, 2010 "around noon," where Grossman and Garcia were present, and told her: "'You are not doing your job well' and 'you are sociali[zing] too much.'" *Id.*, at 3.

DHL investigated the matter and at some point in July 2010 reassigned Galdamez to a new supervisor, Jennifer Campbell. Grossman Decl., ¶ 28. In addition, DHL required St. George to undergo anger management training. *Id.*, ¶ 29. Since July 2010, Galdamez has not worked directly under St. George. *Id.*[7]

On July 13, 2010, Galdamez filed a charge of gender discrimination with the EEOC. *See* [DE 31-10]. The EEOC charge includes a description of Galdamez's injury and the medical note, St. George's denial of light duty, the June 10, 2010 meeting in St. George's office, and his questioning of Galdamez at her car. *Id.* The EEOC charge also contains allegations that St. George "berated" and "humiliated" Galdamez, that he has "a hostile and violent tone" and has made Galdamez feel "physically threatened," and that DHL failed to provide a remedy despite her repeated complaints. *Id.*[8]

**C.     September 2010 Corrective Actions**

On September 8, 2010, Campbell issued Galdamez two written reprimands, known as "corrective actions." *See* [DE 23-7]. The first document states that Galdamez failed to follow

---

[7] As of the date of her 2012 deposition, Galdamez's supervisor was Rafael Medina. Galdamez Dep., at 41:20. In May, 2011, while under Medina's supervision, DHL awarded Galdamez an "Employee of the Month" certificate. *See* [DE 31-20].

[8] Galdamez also contends that female employees at DHL Miami were subjected to "mistreatment" by Jeffrey Grossman, a manager at DHL Miami. *See, e.g.,* [DE-29, at 5]. However, there is no record evidence that Grossman was involved in any of the misconduct alleged in the Complaint. Galdamez also stated in her deposition that her claims are exclusively against St. George. *See* [DE 24-1], at 12:17-24.

proper scanning procedures for incoming shipments needing clearance from U.S. Customs. *Id.*, at 1. This corrective action was ultimately dismissed as untimely. *See* [DE 31-12]. The second corrective action, which was sustained, was issued due to attendance and tardiness issues. *Id.*, at 2. Galdamez refused to sign these reprimands, and on September 17, 2010 filed a grievance challenging both corrective actions. *See id.* [DE 31-12].

St. George's name or signature does not appear on either corrective action. [DE 23-7]. Campbell testified that she was the "sole decisionmaker" and received no input from St. George in connection with the issuance of the corrective actions. Declaration of Jennifer Campbell ("Campbell Decl.") [DE 23-8], ¶ 5. Campbell further testified that as of September 2010, she was unaware: (1) that Galdamez had filed a grievance against St. George in June 2010; (2) that Galdamez's counsel had corresponded with DHL regarding allegations of discrimination against St. George; and (3) that Galdamez had filed a Charge of Discrimination against DHL with the EEOC. Suppl. Decl. of Jennifer Campbell, ¶ 6 [DE 34-9].

### D.   Other Allegations of Harassment Against St. George

Galdamez submitted the following information to support her claim as to St. George's harassing conduct:

- "[St. George] has said at the workplace that 'woman (sic) are not capable of working in operations." Galdamez Decl., ¶ 14 [DE 31-4].[9]

- "At another meeting while referring to some scanners [St. George] said 'these scanners don't work because they were chosen by a woman in [DHL's corporate office in Ft. Lauderdale]." *Id.*

- Galdamez testified that St. George "constantly" checked her duties and tasks, and

---

[9] Galdamez testified on deposition that a co-worker, Versace Luchesi, told her St. George had made this statement. Galdamez Dep., at 136:25;137:1-6.

that he would blame Galdamez for mistakes that she was not responsible for. Galdamez Dep., at 111-12.

- On one occasion in 2010, St. George checked on Galdamez forty-two times while she was scanning boxes at the import deck with another co-worker, Altidor St. Jules. *Id.*, at 93:12-19. Campbell was Galdamez's direct supervisor at the time. *Id.*, at 93:24-25; 94:3-10. Galdamez submitted a copy of an envelope on which she wrote each time that St. George checked on her. *See* [DE 31-16]. Per Galdamez's notes, St. George checked on her twenty-four times. *Id.*

- Two weeks prior to her July 10, 2012 deposition, Galdamez heard from a co-worker, Geraldo Visa, that St. George blamed her for a mistake she did not make involving boxes that were going to Brazil. Galdamez Dep., at 111:12-25; 112:1-4. St. George did not speak directly to Galdamez and did not issue a corrective action in connection with this incident. *Id.*, 112:22-25; 113:1-5.

- At some point in 2012, St. George "tried to contact" Galdamez at work, but she did not respond. *Id.*, at 113:8-14.

### E.    St. George's Conduct Towards Other DHL Miami Employees

In opposing DHL's motion, Galdamez submitted the undated declarations of two current DHL Miami employees, Diana Diaz Castellon and Yvette Tenord, and a former employee, Jeanette Torres. [DE 31-1, 2, 3]. Castellon began working as a service agent in 2007. At no time prior to January 2013 were Castellon and Galdamez assigned to the same shifts. Grossman Suppl. Decl., ¶ 7.

Castellon testified, in relevant part: (1) that she has "experienced discrimination and retaliation under Robert St. George" and Grossman; (2) that the male agents "do not get the mistreatment" that women get; (3) that when she complained for "not getting properly paid for performing lead agent duties," St. George retaliated by assigning Castellon "to Dumping"; (4) St. George helps the male agents "when they are injured even though there is no light duty;" (5) St. George "writes...up" female agents "for any slight," constantly watches the female agents "to the point of intimidation," and screams and treats female agents disrespectfully; and (6) St.

-8-

George has called Castellon a "dangerous witch" on several occasions.  Castellon Decl., ¶¶ 8-9, 13-16.

Tenord's declaration contains similar statements of St. George's favorable treatment of male agents with regard to overtime, discipline, work policies, and "regular day to day treatment."  *See, e.g.*, Tenord Decl., ¶ 8.[10]  As to St. George's conduct toward Galdamez, Tenord asserts that she witnessed St. George "screaming" at Galdamez and "writing her up for any slight mistake."  *Id.*, ¶ 13.[11]  Finally, Tenord alleges that female agents who complained about St. George were "assigned to heavy lifting work."  *Id.*, ¶ 17.  According to Tenord, at one point she was required to lift "over 100 lbs." even though she was pregnant.  *Id.*

Although Jeanette Torres left DHL Miami in 2006, her declaration states that St. George's unfavorable treatment of DHL Miami's female agents included monitoring them closely and bringing every mistake to their attention.  *See, e.g.*, Grossman Suppl. Decl., ¶ 6; Torres Decl. ¶ 5.  According to Torres, after she spoke with her H.R. representative she was convinced not to file any complaints against St. George, "as it was clear that the company was not going to take any action against him."  *Id.*, ¶ 7.  Torres stated that she decided to leave DHL Miami "because the environment under St. George was unhealthy and unbearable."  *Id.*, ¶ 9. The record reflects that Torres received eight corrective actions from various supervisors for excessive tardiness while she was employed at DHL Miami.  *See* [DE 34-6].

On September 21, 2010, Galdamez wrote a letter to three DHL Miami managers – Ken

---

[10]  Tenord testified that she has filed "tons of" grievances against her supervisors for harassment, but that none of these have been against St. George.  Yvette Tenord Dep. [DE-36], at 26:17; 34:14-16.

[11]  Galdamez testified that St. George gave her two corrective actions as her direct supervisor, both of which were issued in 2007.  Galdamez Dep., at 118:5-8.

Grace, Cain Moodle, and Robert Garcia – describing several altercations between St. George and other employees at DHL Miami. The letter described one particular episode in which St. George "fought with Ralph Medina (PM supervisor) verbally in front of all employees." [DE 23-5]. The letter goes on to state that "[s]ince St. George's arrival at [DHL Miami], he has been involved in at least a dozen of (sic) violent problems/arguments with supervisors and agents." *Id.* Finally, the letter stated that St. George was involved in "a plethora of very serious problems" with the following DHL Miami employees: Mark Tauz, Joel Saides, Diane Barrios, and Jennifer Campbell, "and at least half of the warehouse agents and offices (sic) such as the export and import departments." *Id.*

## II.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III.   Analysis

Each of Galdamez's four claims arises under Title VII. Counts I and II are for disparate treatment on the basis of sex, ethnicity, and national origin arising from the denial of light duty.[12] Count III is a claim for hostile work environment, also based on Plaintiff's membership in these protected groups. Count IV alleges retaliation arising out of the June 10, 2010 oral reprimand, the September 2010 written corrective actions, and St. George's conduct with regard to general work supervision matters.

### A.    Disparate Treatment and Retaliation

A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). The Eleventh Circuit has stated that:

> Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. *Carter v. City of Miami*,

---

[12]  Galdamez admitted in deposition that she does not believe "that DHL has a specific issue against people from El Salvador." Galdamez Dep., 11:14-17. Additionally, the record is devoid of any facts to support claims for disparate treatment, retaliation, or hostile work environment on the basis of nationality or ethnicity.

-11-

870 F.2d 578, 580-81 (11th Cir.1989). Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir.1990).

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Here, Galdamez has not identified any statistical or direct evidence of discrimination. Where a claim of discrimination is limited to circumstantial evidence, the Court applies the burden-shifting framework established by *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, after a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employer's actions. *McDonnell Douglas*, 411 U.S. at 802-03. If the employer offers such a reason, the burden shifts back to the plaintiff to show that the employer's reason was pretext for prohibited discrimination. *Id.* at 804. Because Galdamez has failed to establish her prima facie case for disparate treatment and retaliation, DHL is entitled to summary judgment as to these claims.

### 1.   Counts I, II – Disparate Treatment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case of disparate treatment based on circumstantial evidence, Galdamez must show that: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

DHL asserts that it is entitled to summary judgment on the disparate treatment claim because the denial of light labor is not an adverse employment action pursuant to Title VII. "To prove an adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) (citation omitted). The action must be "materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Viewed in the light most favorable to Galdamez, St. George's denial of light duty was not materially adverse. Although Galdamez disputes that St. George denied her request for light duty due to a misunderstanding, it is undisputed that one day after she complained to her manager Galdamez was placed on light duty. The record shows that she remained on light duty for approximately two weeks and then returned to full duty. Around that time, Galdamez went to the doctor and reported that she was feeling no pain; as a result she was given clearance to work full duty. Under these circumstances, St. George's denial of light duty cannot be deemed a serious and material change in the conditions of Galdamez's employment.

Contrary to the authority Galdamez cites, this case does not concern the termination – or even the threat of a termination – of an employee. Galdamez relies on *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249 (11th Cir. 2012), a case involving allegations of disparate treatment and retaliation on the basis of pregnancy.[13] In *Gate Gourmet*, the Eleventh Circuit concluded that the plaintiff had established sufficient circumstantial evidence to raise a reasonable inference that her supervisor's "action in terminating her because of her pregnancy

---

[13] The analysis applied to pregnancy discrimination cases is the same as the analysis in other Title VII sex discrimination cases. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994).

and his inaction in not attempting to find her a light-duty job" violated Title VII. 683 F.3d at 1256.

Here, based on Galdamez's own testimony, it appears that St. George told Galdamez that she could either go home and receive workers' compensation, or stay at work on full duty. Galdamez voluntarily chose to continue working full-duty, and her termination was never at issue. *See Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) (concluding that an *involuntary* transfer to a different position may be deemed adverse if it "involves a reduction in pay, prestige or responsibility."). Given that Galdamez was granted light duty twenty-eight days after her initial request, St. George's denial of light duty was neither serious nor material.

Galdamez's remaining allegations of disparate treatment based on the September 7, 2010 corrective actions and St. George's "constant" and "intimidating" surveillance also do not rise to the level of an adverse employment action. There is no evidence that these actions led to any reduction in Galdamez's pay, position, or benefits at DHL. *See Wallace v. Georgia Dept. of Transp.*, 212 Fed. App'x. 799, 801 (11th Cir. 2006) (written reprimand did not constitute an adverse employment action because it "did not lead to any tangible harm in the form of lost pay or benefits."). In fact, one of the reprimands was dismissed as untimely soon after it was issued. As of July 10, 2012, the date of her deposition, Galdamez remained employed as an international service agent at DHL Miami. Galdamez Dep., at 13:5-7.

Similarly, Galdamez's testimony regarding St. George's excessive surveillance of her work is insufficient to establish an issue of fact as to whether Galdamez suffered a serious and material change in the terms, conditions, or privileges of employment. First, the undisputed

-14-

facts show that after Galdamez filed the grievance against St. George on June 16, 2010, DHL investigated the matter and took steps to address the issue. It transferred Galdamez to another supervisor and required St. George to undergo anger management training. Second, while it is reasonable to infer that being checked on forty-two times in the course of one day was distressing to Galdamez, St. George's conduct did not result in any changes in Galdamez's position, responsibility, or pay. Third, there is no evidence in the record of other episodes involving this level of surveillance. Under these circumstances, Galdamez's prima facie disparate treatment case fails.

### 2.   Count IV – Retaliation

In order to establish a prima facie retaliation case under Title VII, a claimant must show that: (1) she engaged in an activity protected under Title VII, (2) she suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008). Once a claimant has made a prima facie showing, the employer may present legitimate, non-retaliatory reasons for the employment action in question. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). The claimant then bears the burden of proving by a preponderance of the evidence that the reasons given by the employer were pretextual. *Id.*

Galdamez alleges that St. George issued the June 10, 2010 oral reprimand in retaliation for Galdamez counsel's June 9 letter notifying DHL's legal department of Galdamez's complaints regarding St. George. However, Galdamez's prima facie case fails because there are no facts in the record supporting a causal connection between the letter and the reprimand. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse

action were not wholly unrelated." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234-1235 (11th Cir. 2010) (internal citation omitted). To show the two things were not entirely unrelated, the plaintiff must establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2001). Although proximity in time is generally sufficient to raise an inference of causation, it is "insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.*

Here, it is undisputed that St. George was the decision maker as to the June 10 reprimand. St. George testified that at the time of his discussions with Galdamez on June 10, 2010, he was not aware of Galdamez counsel's letter raising claims of employment discrimination. Galdamez fails to present any evidence whatsoever to rebut this testimony. The text of the letter indicates that it was sent via U.S. regular mail to DHL's corporate offices in Plantation, FL, *not* to DHL Miami. Moreover, there are no facts to support the inference that DHL received the June 9 letter before St. George issued the reprimand at noon on June 10, or that any employee at DHL Miami was made aware of the contents of the letter. Without this factual support, Galdamez's prima facie case for retaliation fails. *See Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression....").

The same analysis applies to the two September 2010 corrective actions issued by Jennifer Campbell. Campbell signed the corrective action in her capacity as Galdamez's

supervisor.  Campbell testified she was the "sole decisionmaker" involved in preparing and

issuing the corrective actions, and that at the time she issued the corrective actions she was not

aware that Galdamez had filed a grievance against St. George in June 2010.  The only evidence

Galdamez offers to rebut this testimony is her deposition statement that Campbell was

"[p]robably...following instructions from someone else."  Galdamez Dep., at 85:16-17.  Such

speculation is insufficient to allow a jury to find for Galdamez on this aspect of her claim.

Moreover, in the absence of other evidence showing causation, "[a] three to four month disparity

between the statutorily protected expression and the adverse employment action is not enough"

to satisfy the causal connection requirement.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361,

1364 (11th Cir. 2007).  Under these circumstances, Galdamez's retaliation claim based on the

September 2010 corrective actions cannot survive summary judgment.

      Galdamez's prima facie retaliation case also fails to the extent that it is based on St.

George's excessive surveillance and intimidating conduct.  Essentially, Galdamez contends that

St. George created a hostile work environment through "daily abuse and accusations" and

constant surveillance in retaliation for Galdamez's decision to file the grievance and EEOC

charge. [DE-29, at 14].  The Eleventh Circuit Court of Appeals applies the same factors to

hostile work environment claims regardless of whether such claims are premised on a retaliatory

motive.  *See Gowski v. Peake*, 682 F.2d 1299, 1312 (11th Cir. 2012).  As such, given that

Galdamez's prima facie hostile work environment case fails for the reasons set forth directly

below (*see* § B.), her claim that St. George's harassment was influenced by a retaliatory motive

also cannot survive.

### B.      Count III – Hostile Work Environment[14]

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). A *prima facie* case for hostile work environment requires Galdamez to show that (1) she belongs to a protected group, (2) she has been subjected to unwelcome harassment, (3) the harassment was based on a protected trait, (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of Galdamez's employment and thus created an abusive discriminatory work environment, and (5) the employer is responsible for the environment either directly or vicariously. *See id.*, at 1275. Galdamez's case for hostile work environment fails for want of evidence that the alleged harassment was objectively severe as required by the fourth element.

Determining whether harassing conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) (quotations omitted). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* Viewing the facts in the light most favorable to Galdamez, there is

---

[14]  Summary judgment may be appropriate in hostile work environment cases. *See, e.g., Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006).

-18-

no dispute that she subjectively perceived her treatment to be so severe or pervasive to alter a term or condition of her employment. *See Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997) (finding that the fact that plaintiff was humiliated and upset by her supervisor's hostile remarks satisfied the subjective component).

However, not all objectionable conduct or language amounts to discrimination under Title VII. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir.2010). Title VII is not a "general civility code," and "simple teasing ... offhand comments, and isolated incidents (unless extremely serious)" do not constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted). Workplace conduct is viewed cumulatively and in its social context. *Reeves*, 594 F.3d at 807.

As to the objective component, four factors are important in assessing whether the alleged harassment altered Galdamez's terms or conditions of employment: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating, or simply a derogatory utterance, and (4) whether the conduct unreasonably interfered with the employee's job performance. *Mendoza*, 195 F.3d at 1246. Considering these four factors, Galdamez's evidence does not satisfy the level of specificity required to support a finding that the alleged harassment was objectively severe and pervasive.

St. George's two statements that women "are not capable of working in operations" and that some package scanners were not working "because they were chosen by a woman"[15] do not rise to the level of being physically threatening or humiliating and constitute derogatory utterances. Moreover, Galdamez adduces no evidence to show that these statements, or other

---

[15] Galdamez Decl., ¶¶ 14, 15.

derogatory statements, were made on a frequent basis to Galdamez or other female employees at DHL Miami. Furthermore, Galdamez's allegations of "constant surveillance, screaming, and disrespect[ ]" towards women are simply too general to support a finding that St. George's conduct was frequent or severe. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value") (internal quotation marks deleted).

Taking the statements of constant surveillance, yelling and disrespectful language at face value, Galdamez offers no probative evidence to find that St. George's conduct was so objectively severe that it altered the terms of her employment. For example, Galdamez testified at deposition that St. George called her into his office "every single day" and told her that she was "not doing [her] job." Galdamez Dep., at 124:24; 125:1-2. However, Galdamez makes no connection between these actions and her gender.[16] The same is true of Galdamez's testimony that St. George mistakenly blamed her for an error involving a shipment of boxes in 2012. Viewed in the light most favorable to Galdamez, St. George's conduct was not sufficiently severe and pervasive, and did not unreasonably interfere with Galdamez's job performance. In fact, St. George never spoke directly with Galdamez about the incident, did not issue a corrective action in connection with the incident, and even admitted – once he learned that Galdamez was not in charge of the boxes at the time – that Galdamez was not responsible for the error. *See* Galdamez Dep., at 112:1-4.

Notably, Galdamez's September, 2010 complaint letter to DHL's management makes no reference whatsoever to St. George's misconduct towards women in general or Galdamez

---

[16] Galdamez's assertion that she was called into St. George's office "every single day" is not corroborated by any evidence in the record.

specifically. *See* [DE 22-5]. Instead, the letter describes a specific altercation between St. George and another male employee and also asserts that St. George had been involved "in a plethora of very serious problems" with two additional male and two female employees, including Jennifer Campbell.[17]  In short, there is insufficient evidence for a jury to conclude that DHL created a workplace filled with intimidation and ridicule that was sufficiently severe and pervasive to alter Galdamez's working conditions.

## IV.   Conclusion

It is clear that the Galdamez fervently believes she has been discriminated against because she is a woman.  Unfortunately, taking all of the evidence in the light most favorable to the Plaintiff, there is at best, only a scintilla of evidence to support her claims.  Under the law, this is insufficient to submit this case to a jury. Therefore, for the foregoing reasons, it is

ORDERED that

1.      Defendant DHL Air Express (USA), Inc.'s Motion for Final Summary Judgment [DE-22] is GRANTED.  A final judgment will be entered by separate order.

2.      This Case is CLOSED.

3.      All pending motions are DENIED as MOOT.

DONE AND ORDERED in Miami, Florida, this *19* day of August, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record

---

[17]  To the extent that St. George may have an abrasive personality, it is not the Court's role in this Title VII case to question DHL's decisions relating to his employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) ("Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.") (internal quotations omitted).

-21-